84 F.3d 353
 96 Cal. Daily Op. Serv. 3597, 96 Daily Journal
D.A.R. 5821
Ever QUINTANILLA, Plaintiff-Appellant,
v.
CITY OF DOWNEY; Clayton Mays; R.R. Wells; Officer
Biarnesen, in his personal and official capacity;
J. Hoekter, in his personal and official
capacity, Defendants-Appellees.
 No. 94-56550.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 11, 1995.
Decided May 22, 1996.
 
 Donald W. Cook and Robert Mann, Los Angeles, California, for plaintiff-appellant.
 John C. Burton, Pasadena, California, for plaintiff-appellant.
 S. Frank Harrell, Franscell, Strickland, Roberts & Lawrence, Santa Ana, California, for defendants-appellees.
 Appeal from the United States District Court for the Central District of California; Lourdes G. Baird, District Judge, Presiding.
 Before: SCHROEDER and O'SCANNLAIN, Circuit Judges, and BURNS,* District Judge.
 ORDER
 SCHROEDER, Circuit Judge:
 
 
 1
 Plaintiff Ever Quintanilla appeals from a judgment entered after a jury verdict against him in his 42 U.S.C. § 1983 suit against the city of Downey, its police chief, and three individual officers. The suit alleged that the use of a police dog to search and detain Quintanilla during his arrest violated his rights under the Fourth Amendment. Plaintiff challenges the district court's denial of his motion for a directed verdict on the issue of deadly force, its denial of his motion for a new trial because of allegedly erroneous evidentiary rulings and jury instructions, and its entry of judgment for the police chief and the city on the basis of jury findings that the individual police officers did not violate Quintanilla's constitutional rights.[1] We affirm.
 
 BACKGROUND
 
 2
 Shortly after midnight on July 27, 1991, the city of Downey's police dispatcher radioed a report that a Ford Bronco had been stolen. One officer spotted the Bronco, driven by Quintanilla, and began a high speed chase through various residential areas. The auto chase ended in a dead-end cul-de-sac, where Quintanilla got out, threw an empty vodka bottle at the officer, scaled a barbed-wire fence, and vanished into a poorly lit truck-yard.
 
 
 3
 Other line officers, including defendant Randy Wells, arrived at the cul-de-sac and picked up the pursuit using a trained, German Shepard police dog. Wells announced that if Quintanilla did not surrender voluntarily, a canine unit would be released to find him. After receiving no response, Wells released the dog, which almost immediately found Quintanilla hiding between two trucks, beyond the officers' reach. The dog bit Quintanilla's arms and legs. The officers heard the scuffling, ran to the scene, and observed Quintanilla in control of the dog, holding it in a head-lock. Wells repeatedly ordered Quintanilla to release the dog and surrender, but he refused. Wells then entered the area between the trucks, dragged Quintanilla out into an open area, where the other officers handcuffed him, and ordered the dog away. The dog immediately complied. The scuffle with the dog lasted approximately one minute. Quintanilla required medical treatment but suffered no serious injuries.
 
 
 4
 Quintanilla sued Wells and the two assisting line officers, Keith Biarnesen and John Hoekter, on various federal and state grounds, including the asserted use of excessive force through the deployment of a police dog in violation of Quintanilla's right to be free from unreasonable searches and seizures under the Fourth Amendment. Quintanilla also sued the city of Downey and its Police Chief, Clayton Mayes, alleging their maintenance of an unconstitutional custom or policy involving police dogs. See Monell v. Dep't of Social Services of City of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Prior to trial, the district court, over Quintanilla's opposition, bifurcated the claims against the three individual line officers and the Police Chief and city, so that the first phase of the trial would address the excessive force claim against the individual officers, and the second phase the Monell claim against the Chief and city. The court, relying upon City of Los Angeles v. Heller, 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986), ruled that if the jury found that the three line officers committed no constitutional transgressions when they used the dog to arrest Quintanilla, then the city and Chief would be absolved, as a matter of law, from any liability under Monell. The court thus required plaintiff to show during the first phase that the use of the police dog on this occasion led to a constitutional deprivation. Accordingly, in a pre-trial ruling, the court excluded from the first phase any evidence of police dog use in other situations. Plaintiff offered such evidence to prove the existence, under Monell, of an unconstitutional policy. This evidence included graphic photographs, from unrelated cases, of police dog bite victims; medical summaries, prepared for an unrelated case, of persons bitten by police dogs; a videotape of a police dog attack in a different case, and a police dog training videotape.
 
 
 5
 Plaintiff, in an attempt to circumvent the district court's bifurcation and evidentiary rulings, voluntarily dismissed the three individual officers so that he could offer evidence of the policy during the first phase. The district court rejected the offer as an attempt to influence the jury with other incidents, and admitted only evidence relevant to the issue of the individual officers' liability in Quintanilla's case. In doing so, the court excluded testimony from Mr. VanNess Bogardus, a police practices expert, and Dr. Peter Meade, a medical expert. At the close of evidence, the court denied plaintiff's motion for a directed verdict. The jury then returned a special verdict finding that the individual officers had not used excessive force in violation of plaintiff's Fourth Amendment rights. Accordingly, the court entered judgment for the Chief and city on the grounds that Monell liability may not arise absent a constitutional violation of the plaintiff's rights. It then denied plaintiff's motions for judgment as a matter of law and for a new trial. Plaintiff timely appealed.
 
 
 6
 On appeal, Quintanilla argues that the district court erred in 1) entering judgment on the Monell claim for the Chief and city solely on the basis of the jury's finding that the individual officers did not violate plaintiff's constitutional rights; 2) denying his motion for a new trial based on the exclusion of the photographs, medical summaries, videotapes, and expert testimony; 3) denying his motion for a new trial based on the failure to give instructions relating to the use of deadly force; and 4) denying his related motion for directed verdict on the issue of deadly force.
 
 DISCUSSION
 The Monell Claim
 
 7
 Underlying this entire appeal is plaintiff's position that he should not have been required to show that the individual police officers violated his constitutional rights before proceeding on the theory that the Chief and city maintained a policy that resulted in the constitutional violation of other individuals' rights. The dispositive authority is City of Los Angeles v. Heller, 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986)(per curiam). The Supreme Court there held that a public entity is not liable for § 1983 damages under a policy that can cause constitutional deprivations, when the factfinder concludes that an individual officer, acting pursuant to the policy, inflicted no constitutional harm to the plaintiff. Id. at 799, 106 S.Ct. at 1573; see also Palmerin v. City of Riverside, 794 F.2d 1409, 1414-15 (9th Cir.1986). In so holding, the Court said:
 
 
 8
 [i]f a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point.
 
 
 9
 475 U.S. at 799, 106 S.Ct. at 1573 (emphasis in original). Thus, an individual may recover under § 1983 only when his federal rights have been violated.
 
 
 10
 Plaintiff cites Chew v. Gates, 27 F.3d 1432, 1438, 1445 (9th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 1097, 130 L.Ed.2d 1065 (1995), and Hopkins v. Andaya, 958 F.2d 881, 888 (9th Cir.1992), for the proposition that a police department may be liable under § 1983 for damages caused by unconstitutional policies notwithstanding the exoneration of the individual officer whose actions were the immediate cause of the constitutional injury. While this may be true if the plaintiff established that he suffered a constitutional injury, and the officer's exoneration resulted from qualified immunity, see Palmerin, 794 F.2d at 1414-15, this proposition has no applicability here. Plaintiff failed to establish that he suffered a constitutional injury.
 
 
 11
 In the instant case, plaintiff's strategy was to convince the jury to award him damages on the strength of evidence concerning police dog attacks on others. The district court, under Fed.R.Civ.P. 42(b), in the interest not only of convenience and judicial economy but also the avoidance of potential prejudice and confusion, bifurcated the trial of the individual police officers from the Chief and city. See Larez v. City of Los Angeles, 946 F.2d 630, 635, 640 (9th Cir.1991). The bifurcation enabled the court to separate the questions regarding the constitutionality of the three officers' actions from the questions regarding the Chief and city's liability under Monell. Plaintiff was not entitled to circumvent the bifurcation and evidentiary rulings by voluntarily dismissing the three individual officers and proceeding to demonstrate the existence of a policy using evidence of attacks more severe than his own. Under Heller and general principles of § 1983 liability, an individual may recover only when that individual's federal rights have been violated. The district court correctly entered judgment for the Chief and city based on the jury's special verdict that plaintiff's rights were not violated.
 
 Evidentiary Rulings
 
 12
 Because of the bifurcation order, the court, in a pre-trial ruling, excluded from the first phase of the trial evidence submitted for the purpose of demonstrating the existence of an unconstitutional policy. This evidence included summaries of medical treatment rendered to persons bitten by police dogs, and prepared for an unrelated case; photographs of injuries inflicted by police dogs in unrelated incidents; a police dog training videotape; and a videotape of an arrestee being attacked by a police dog. During trial, the court also excluded testimony from medical expert Dr. Peter Meade about the nature and severity of injuries resulting from police dog attacks, the likelihood of infection, hospitalization rates, and the potential for death; and expert testimony from Mr. VanNess Bogardus, a police dog trainer and handler, about the training of police dogs and the severity of injuries caused by police dogs.
 
 
 13
 Quintanilla argues that the district court abused its discretion when it excluded this body of evidence. He is incorrect. At issue during trial, was whether the individual officers' use of the police dog in this particular case was unconstitutional. Had counsel offered the evidence with instructions limiting its relevance to this issue, it may well have been admissible to demonstrate the dog's capacity for causing serious injury. See Chew, 27 F.3d at 1453-55 (Norris, J., concurring in part and dissenting in part) (dog's capacity for causing serious bodily injury is relevant to whether it constitutes deadly force); United States v. Moore, 846 F.2d 1163, 1166-67 (8th Cir.1988) (expert testimony regarding the types of infections that can result from a human bite is relevant to whether defendant used his mouth and teeth as a deadly weapon). However, counsel offered the evidence to show that the Chief and city's policy of using police dogs, rather than the individual officers' use of this particular police dog, was unconstitutional. As such, the evidence was premature. The Chief and city's liability under Monell was not yet at issue. Admitting evidence pertaining to the Monell issue could well have unfairly prejudiced the Chief and city and confused the jury as it considered the individual officers' actions.
 
 
 14
 In addition, the relevance of the training videotape is questionable because it showed dogs that were trained to bite and hold the arm; whereas the dog in this case was not so trained. Moreover, the numerous photographs of the dog bite victims and the videotape of the attack were unusually graphic and probably unfairly prejudicial. The district court acted well within its discretion in excluding the contested evidence.
 
 Excessive Force
 
 15
 Quintanilla's remaining challenges rest on Tennessee v. Garner, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), where the Supreme Court delineated the conditions in which police officers may use deadly force to affect an arrest. He argues that he deserves a new trial because the district court erroneously failed to give deadly force instructions based on Garner. In a related argument, he contends that he is entitled to a directed verdict because the use of the police dog during his arrest violated the deadly force rule in Garner. Defendants argue that the test in Garner was subsumed into the excessive force rule set out in Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), and is not a separate test. They maintain that the district court properly instructed on excessive force, and correctly denied the directed verdict.
 
 
 16
 In Garner, a police officer investigating a nighttime burglary shot to death an unarmed, fifteen-year old suspect in order to prevent him from escaping over a fence. The Court first held that "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." 471 U.S. at 7, 105 S.Ct. at 1699. It then observed that the reasonableness of the seizure turned on a balancing of the nature and quality of the intrusion against the countervailing governmental interests at stake. Id. at 8, 105 S.Ct. at 1699. After conducting this balancing analysis, the Court concluded that the use of deadly force is reasonable only if: 1) it is necessary to prevent escape; 2) the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to him or to others; and 3) if feasible, the officer has given some warning. Id. at 3, 11, 105 S.Ct. at 1696, 1701. The Court held that the officer's actions violated the Fourth Amendment.
 
 
 17
 Four years later, in Graham, the Supreme Court extended the Fourth Amendment balancing analysis to cases involving non-deadly force.
 
 
 18
 Today we make explicit what was implicit in Garner's analysis, and hold that all claims that law enforcement officers have used excessive force--deadly or not--in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard ...
 
 
 19
 490 U.S. at 395, 109 S.Ct. at 1871 (emphasis in original). In so holding, the Court set forth a list of factors to be considered in determining whether the force used was excessive. The Court stated that the nature of the force used by the law enforcement officer should be considered in light of the totality of the circumstances, including: 1) the severity of the crime at issue; 2) whether the suspect poses an immediate threat to the safety of the officers or others; and 3) whether the suspect actively resists arrest or attempts to evade arrest by flight. Id. at 396, 109 S.Ct. at 1872. Garner and Graham set forth somewhat different standards for proving a Fourth Amendment excessive force violation. See Fikes v. Cleghorn, 47 F.3d 1011, 1014 n. 2 (9th Cir.1995); Chew, 27 F.3d at 1442; Ting v. United States, 927 F.2d 1504, 1509-10 (9th Cir.1991). The Garner standard, if not subsumed into the more general Graham formula, however, can apply only when deadly force has been used. Deadly force has been described as "force that creates a substantial risk of causing death or serious bodily harm." Fikes, 47 F.3d at 1014; Chew, 27 F.3d at 1453 (Norris, J., concurring in part and dissenting in part). We first consider whether the jury could have rationally concluded deadly force was used in this case.
 
 
 20
 Two recent decisions in this circuit have explored the meaning of deadly force in relation to police dogs. In Chew, this court reversed a summary judgment for the Los Angeles Police Department, finding that the plaintiff had raised a genuine issue of fact as to whether the use of a police dog during his arrest constituted excessive force in violation of the Fourth Amendment. Judges Reinhardt and Norris formed a majority in reaching this result, but did so for different reasons. Judge Reinhardt concentrated on whether the dog attack was excessive under Chew, 27 F.3d at 1440, in holding that there was a triable issue. Judge Norris concurred, but concentrated instead on the test for deadly force under Garner. Id. at 1452. He said that the victim's severe lacerations and nearly severed arm, and the testimony that the dog, as trained and deployed, could cause serious and sometimes fatal injuries was sufficient to raise a genuine issue of fact as to the use of deadly force. Id. at 1453-55; see also, Moore, 846 F.2d at 1166 (what constitutes a deadly weapon depends not on the nature of the object itself but on its capacity, given the manner of its use, to endanger life or inflict great bodily harm).
 
 
 21
 In Fikes, the plaintiff offered evidence of superficial bites on his arm and shoulder. 47 F.3d at 1014-15. Moreover, the dog was trained to release arrestees on command and it did in fact release Fikes on command. Id. We held that this evidence did not support a jury instruction on deadly force. Id.
 
 
 22
 Quintanilla asserts, on the basis of the evidence admitted at his trial, that the district court erroneously failed to give deadly force instructions based on Garner. His assertion is unfounded. The instant case is, on the facts, indistinguishable from Fikes. Quintanilla suffered only non-life threatening injuries that did not require serious medical attention. Moreover, the dog was trained to release on command, and it did in fact release Quintanilla on command. In light of these facts, and the absence of admissible evidence regarding this particular dog's capacity for harm, the district court correctly refused to give deadly force instructions.
 
 
 23
 Quintanilla's corollary argument is that the district court erroneously denied his motion for a directed verdict because the use of the police dog violated Garner's deadly force rule. This contention is similarly without merit. From our conclusion that the evidentiary record did not support a deadly force instruction, it must follow that a jury could reasonably find that the use of the police dog here did not create a "substantial risk of causing death or serious bodily harm." See Fikes, 47 F.3d at 1014. The district court, therefore, properly denied Quintanilla's motion for directed verdict.
 
 
 24
 AFFIRMED.
 
 
 
 *
 Honorable James M. Burns, Senior United States District Judge for the District of Oregon, sitting by designation
 
 
 [1]
 Plaintiff also argues that the district court erroneously refused to instruct the jury with regards to self-defense. We summarily dispose of this contention because it has no basis in the law, and is therefore without merit